Mr. Becerra got to tell his entire story to his probation officer Mr. Becerra got to tell his entire story to officer number one. Mr. Becerra got to tell his entire story to officer number two. Mr. Becerra did not get to tell his entire story to the jury of his peers when he went to trial for felon in possession of a firearm and felon in possession of ammunition. He was found guilty and sentenced to 80 months. In my brief, I've outlined a number of issues, but I would like to begin with the testimony in which I try to argue that he should be allowed to argue for innocent possession. The government had brought a motion in limine asking that his testimony be precluded from arguing why in fact he was in possession of a firearm in possession of ammunition on May 5th, 2015. Prior to trial, I think where I'm left with the briefs without reading the testimony carefully is why it isn't what he actually testified to after the in limine ruling. What what didn't he get to say that was that would be that would be reverse, you know, reversibly prejudice that's reversible error. You know, he did not get to testify as to the possession of the firearm was transistor Terry and the fact that he found the firearm and immediately tried to turn it into his probation officer. All he was allowed to say is, as soon as he found the firearm at some point on three different occasions, he tried to meet with his probation officer, but the jury never had why it was thought he testified that he did it. After the encounter with the airport police, he drove to the probation office to turn in the weapon. He did not get to say to 10 in the weapon. I believe it was that he said he drove to his probation officer to see his probation officer at many times during the testimony. The court reminded him that he could just answer yes or no questions, and I was reminded to make sure that I obeyed by the court's order not to get into that reasoning. So we never actually got to say those words that I want to do 10 in my firearm council. I want to ask a predicate question that we've that we've sort of turned into a question. You ask after assume without deciding, which is why should we? Why should we recognize the innocent possession defense? And I say that because five circuits have suggested no, and you've got the DC circuit. I don't see any. If you can find a textual hook for it, that would help me out. But I don't see any textual hook for it either. You're in a the court is right. There have been many circuits that have not recognized innocent possession, but I think there was an example in the Mason decision that talks about, let's say, for example. Somebody that's a felon is walking along down the street and sees a backpack. They pick up that backpack and inside that backpack is a firearm and they know it's a firearm. They're a felon. They've been around guns before. They look at it and they're like, oh, my God. Now, technically, they are guilty of knowingly possessing a firearm as a felon. They're a felon. They've now opened up that bag and there's a firearm inside that. But couldn't Congress have been concerned about exactly that situation, too? So a felon finds a bag and let's say the police station's five blocks away. And instead of immediately calling and leaving the bag there, felon takes the you knows that there's a gun, takes the backpack and then sees his arch enemy two blocks down, pulls out the weapon and fires at him. I mean, it's a far it's somewhat of a far fetched scenario. But I mean, that that could have been part of what Congress that it's just inherently dangerous to have felons running around with with guns. Sure. That part is true. But let's take just that five minutes of when he's opened up that backpack and looking, going, oh, my God, that's that is opens it up. It's not a BB gun. It's actually a Glock. Yeah. So now he's guilty. And I find it hard to believe that Congress said, oh, that wouldn't be knowing. Well, I guess would be knowing possession. Well, what if he immediately threw it down, you know, and said, I got to walk away from this. And then he called the police and said, hey, there's a there's a backpack sitting there on the corner of whatever street and whatever street in 922 G. Congress hasn't said how long somebody has to possess that firearm. So does it have to just be that one second that he looks at it, realizes a gun, throws a backpack down? Is that enough? So that's why we have to have an out and let a jury decide. Is that enough to say that a felon knowingly possessed a firearm such that he's guilty of an offense and a 922 G or nine? Is there a textual hook for this or is this more of an equitable, just not fair type of defense, do you think? I'm not sure about that. But I do think it's something that should be left up to a jury that they can hear, hear the evidence and decide, OK, we now have. A jury instruction that tells us what innocent possession is and do these facts fit that innocent possession such that the person is not guilty and Mr. Becerra never got an opportunity to even tell his entire story, not only to the judge, he got to tell it, he got to make a proffer of his testimony. Yes, your honor, he did. But the judge heard what he proposed to say. But I want the court to keep in mind this isn't correct, sort of. He did get to read a document that he had written and it was towards the jury. And as I had said to the district court judge at the time, it would be different if I was asking him the questions. And here's why we have to keep in mind. Mr. Becerra was an individual that not once but twice had been found incompetent by the Bureau of Prisons. The third time they said he is delusional, but it is competent and we have to keep his delusions to the side. So it was very difficult for him to get up and just proffer and give a statement. And as the court may recall, in the trial testimony, it's not just about what happened that day. He veers off in very different angles. I wanted to have the opportunity to be able to do a direct examination, ask him questions about what happened at the airport with the airport police. What happened from 4.30 in the morning to 8 o'clock in the morning, and why it was he was knocking on a probation officer's door at 8 o'clock in the morning. And why it was that he didn't tell the airport police about the firearm itself. And several times when I attempted to ask that question, I was objected to and the court sustained that objection. So we never really fully got to even tell a story in a proffer because it was difficult for him. It is somebody that we're dealing with mental illness. And again, the delusions was still there. So I think it would have been different if he was actually giving trial testimony versus doing a proffer. Well, he was able to place in the record the kind of the parameters of his account, which was that he had possession of the firearm for seven hours, right? Yes. And after discovering it at the airport. That's correct. And that there were airport police. Yes. And he made two or three visits to the probation office without dropping off the firearm, turning it in, disclosing that he had it. That's correct. So don't you think, I mean, wasn't that enough for the judge to, in this case, to understand what his proposed testimony was going to be? And to make a decision whether that testimony really, as a matter of law, could support this defense if we were to recognize it? Well, your honor, I think part of the problem is that you have to look to see what the, under the mason, you have to look to see, did the person try and attempt to get rid of the gun? And that's the part where we never got to really explore, because there was a reason why he didn't want to turn in the firearm to the airport police. There was a reason why he didn't want to turn it into the Burnsville police. Because as the court may recall, there was a time period after he left his probation officer for the second time, he drove to another police department that he did not turn in those firearms. And that part, I think, would explain why it was that he had a firearm for seven hours, and it wasn't until he got to his probation office and actually met with that probation officer that he wanted to then turn into the gun. However, I was not allowed to get into why he wasn't turning in the firearm to other police departments. And I think that's an important fact, because under mason, under the second prong, you have to be able to explain, did you try and turn it over? Did you try and do something to get rid of that gun? And that was not explored at all. What's in the record? You mentioned some psychological issues. Was that, was there a proffer made as to that? The court- Those circumstances. Yes, your honor. There was, not during the trial itself, but prior to court there was. There was many hearings on the magistrate level about his competency. There was also a sealed hearing in which Mr. Bracera was not satisfied with my representation, had been sending what I would describe as rambling letters to the court. And I actually think it's a part of this docket, too, that he sent some letters here. So the court was aware of some of the mental health issues that Mr. Bracera's having. There was also the last competency exam that was filed on ECF that said he continues to have delusions, but there's nothing we can do about it. Well, but that sounds like it has to do with his competency for trial, things like that. I'm talking about a proffer of evidence which would back up what I understand is the claim that for mental reasons, mental issues, that explains why he didn't turn this weapon in earlier and why he had it for seven hours. So what I'm asking is, what's in the record? What's in the trial record as far as a proffer of that kind of evidence? Or do you think the judge was just to assume that that testimony would be offered if the defense had been permitted? Your honor, the probation officer, Bobby Harrington, testified. At some point, she received a call from Minneapolis police, and they were concerned about Mr. Bracera's mental well-being. And they took him to HCMC for a mental evaluation. She also testified she was very concerned about his mental health stability, and that he had left a lot of rambling messages that were nonsensical messages, a lot of rambling, and she didn't know mentally how he was feeling. So we did actually have testimony about that, that I recall. Thank you. And your honor, I would like to reserve the rest of my time. Thank you. Thank you. Miss Littlecap. Good morning, your honors, and may it please the court. My name is Lindsay Middlecamp. I was part of the trial team that tried Mr. Bracera's case, along with my colleague, Brad Endicott. Today, I'll focus my response to the main issue that Ms. Atwell raised, which is the innocent possession defense and the scope of Mr. Bracera's trial testimony. I think this court asked just the exact right questions. One of the right questions- Let me go further than the questions already asked and tell you that my concern about this issue. Is almost exclusively focused on the bottom of page 58 in your brief, where you write, you don't need to, I'll just, it's short. The district court correctly found, based on this court's precedent, that Bracera could not meet the prerequisites for the defense. Particularly the second prong of the Mason decision, if we were to adopt it. That use of the word found, why isn't this a jury issue? In other words, the district court heard a proffer. I think construed that as being what the substance of the testimony that the motion in limine was addressing. And found that that did not meet the defense, that the defendant's defense counsel was urging. What case law says that that's a proper role for the court to cut off a defense? Because I don't think if the jury heard it, the jury would find that the defense was met. That sounds like a corruption, if you will, of the roles. I understand your question, Your Honor, I believe. And ample case law supports that in the sense that the judge is off, the district court judge is often tasked with assessing whether there has been a sufficient factual basis presented on a proffer to rise to the level of meriting an affirmative defense. In the defense brief, they were rather at the trial, defense counsel compared this to an entrapment defense or other affirmative defenses that a defendant might raise. And it is frequently the role of the district court judge to either hear a proffer or to hear argument on what is the- where the court made the ruling not after hearing the testimony that the jury heard. But in a ruling on a motion in limine that deprived the court and the jury of hearing the way the defense would have played out in a testimonial environment. Several cases I'll present the court with. Some that are directly on point as to the innocent possession defense. This circuit's own cases where the circuit has declined to decide whether the defense applies, but has found that the district court properly ruled based on a proffer and the evidence in the record that there wouldn't be a sufficient, even if Mason applied to this circuit, the facts are not sufficient to put that to a jury because they didn't establish the second proffer. Which ones were based on a proffer rather than the testimony itself and the refusal to instruct after everybody heard the testimony? Your Honor, I don't recall whether Wright involved a proffer or testimony. But the role of the district judge is the same in the sense that the proffer is an opportunity to give the best case scenario of what might come in. And in fact, I'll note, so to answer the court's question, the site would be 682 F 3rd, 1088, that's United States v Wright. Yeah, I think that's in your, I think that's in the briefs. I believe it is. And with other cases that I have studied them from this perspective. But I would also point the court to other case law governing the not unfettered right to testify that a defendant has assessing whether an affirmative defense can apply. So that could be the Supreme Court decision in Taylor v Illinois, which dealt with whether sufficient basis had been given to put in certain experts that weren't relevant. And also United States v Young, which is a Supreme Court decision in which the court was evaluating whether a defendant was entitled to an affirmative defense and determined prior to putting it to a jury that the facts put in simply weren't sufficient. And that that is an assessment for the trial judge. I think, Your Honor, you've asked the right question that if there were a borderline issue, if the facts seem to rise on an available affirmative defense, then that would be a question for the jury to weigh if it applies and for counsel to argue. But here, this court's analysis should essentially be two prong. One, the affirmative defense is not available under the statute. So as a matter of law, it should not be put to the jury. And two, if the affirmative defense were available, giving the defendant's best day in court, both based on his proffer, but also, I'll note, the defense counsel had an ample opportunity to extend on the, expand on the proffer. The court actually engaged in some colloquy and inquiry with Ms. Atwal. Why did the government create this appeal issue by moving for a motion in limine? I mean, sure, he was going to be a difficult witness if he chose to testify. But, I mean, this is sort of like, Judge, I have to get in my 10-404-B cases and not just two. Respectfully, Your Honor, the government was seeking to avoid jury nullification that the defense had signaled quite a bit was going to be its primary theory of defense. Well, but why? Why avoid jury nullification? You can handle, you know, improper jury nullification in the middle of the testimony with the courts instructing the jury to disregard that and cautioning the defendant not to do it. Your Honor, to the extent that if- Instead, we have a notion you've precluded the defense, the jury, from hearing an arguably lit defense. I mean, you've raised, you've poked into the constitutional provision that allows a fair defense to be heard. Your Honor, that constitutional right, although fundamental, is not, and I'll quote the Supreme Court on this, it is a weapon, but it is not a weapon that can be used irresponsibly. And so when a defendant is clear in advance of trial that their primary theory of defense is going to be jury nullification, it's going to be a defense that is not available under the law, and instead an appeal to sympathy or an appeal to a sense of justification that is not available, it is appropriate to ensure that the trial limits itself- I mean, prosecutions, nullification's about the only practical argument you got if you choose to testify. But, Your Honor, the Constitution does not guarantee a defendant the right to argue issues that are neither relevant nor available under the law. But this was, the court did not rule this was not available under the law, and that's the problem. The court declined- And precluded the testimony for that reason. You're right, Your Honor. Or the court could have said, I'm going to carefully control, this is all nullification stuff in your proffer, most of it, I'm going to control that. That is- But it went further and found that if the jury heard this, it couldn't possibly find him innocent by reason of this defense. It seems awfully close to what you admitted in the borderline case, you ought to let the testimony in and then see where it takes you. Your Honor, I'll note on the facts of this case, and I think I understand the court's concern, the cases that other circuits have identified as those borderline cases typically involve 10 to 15 minutes of transitory possession and a straight path to forfeiting the gun or distancing. Yes, Your Honor. I have a question. How did this come up? I mean, if this were going to be asserted in this trial as a defense, wouldn't there be a jury instruction requested? Correct, Your Honor. Was there a jury instruction requested on innocent possession? Not formally, Your Honor, and that raises an interesting procedural problem with the defense's position on this appeal, which in their brief they say the court improperly denied us this instruction and we should have been allowed to assert the defense. But if the court reviews the record, what in fact was put forward in the pretrial motions and at trial itself was we want him to be able to give a innocent possession narrative so that he can tell his entire nullification story, but we haven't decided yet whether we will seek the formal defense. And the argument by defense was essentially the jury is smart enough that if we present them with a lot of irrelevant nullification-type testimony and we don't get an instruction that allows them to use that testimony, the elements themselves of 922 should be enough to keep the jury from being confused. It wasn't until the court made its ruling on the proffer that he should not be allowed to stray so far into nullification testimony that the defense essentially said, I object to that limit. So it is not clear from the record to me that an instruction was formally requested, but after, and this gets me to a question that I think. Well, I'm not sure I understand all of that. What I was talking about is a law you're drafting a proposed instruction and offering it to the court for a ruling. And Judge, I would like for you to give this instruction. Did that happen? The instructions presented by both parties sought simply to present the elements of 922. However, after Mr. Becerra testified and still was in fact able to tell his entire story, the government sought an additional curative instruction that his intentions during possession were not relevant to the question. Is this the one that said the reason the defendant may have had for possessing the firearm and ammunition is irrelevant? Yes, Your Honor. Was there an objection? There was an objection. And so I think that's more than there was. There was an objection to that instruction. Correct. And the objection was it's not necessary that the jury is clear enough on the law that that is overkill in explaining what it is. The court overruled that objection and presented it. And that's because I and I'll respectfully disagree with Ms. Atwell's description of the record. Mr. Becerra was in fact able to get his entire story in. On direct, he repeatedly said, after I found the gun, I went directly to my probation office. When it wasn't open, I did some other things, and then I went directly back. And then on cross, he continually repeated 12 times, I was trying to do the right thing, and that's why I was going directly to the probation office after finding my gun. I'll also note that during the proffer and in the post-proffer discussion with the court, the defense was able to delve very deeply into the issue of, yes, he had these interactions with different law enforcement, but he did not trust the law enforcement, and that's why he didn't turn it in. So the court, in reaching its decision on what the scope of his testimony could properly be under the law without putting in irrelevant, confusing, nullification arguments, was based on this. In his best day in court, if he is able to establish he did not trust other law enforcement, he was trying to do the right thing, he was trying to take it directly to probation to turn it over, the court determined that those did not rise to the factual predicate to support the availability of this defense, if the defense even exists. But Judge Strauss asked, if I can segue, you asked a question about the statutory language itself. And I'll note that post-briefing, there's actually a Sixth Circuit that has joined the position, this is not in the statute and it cannot be read into the statute. And two cases have come out since briefing from the Eleventh Circuit that hold that. So now there's seven circuits total that have drawn the innocent possessor into doubt? Six circuits that have said as a matter of law on the statute it doesn't exist. The D.C. Circuit is the only circuit that has said we're going to make it available. And then other circuits like the Eighth Circuit and the Seventh Circuit has said, we're not sure if it's even available, but if it is, these facts wouldn't be the ones to make it available. Are the Sixth and Eleventh Circuit cases, they're not in your briefs? Did you file a Rule 28J on those? I did not, Your Honor. Could you do so? Could we do so? Yes. Certainly, Your Honor. Thank you. Yes. And I will note just for today's record that both of them involved, again, short periods of time, 10 minutes, 15 minutes of possession and immediately trying to get yourself to law enforcement. And the record here is extremely clear that Mr. Becerra found a gun, if his testimony is to believe, he found the gun innocently while he was or shortly after interacting with airport police. He could have gone to them, did not. He then did a series of errands and the court found based on whether or not he took the gun with him into Walmart, that he had handled the gun, that he had told officers that he had taken the gun with him to protect himself, and then ultimately six-plus hours later, after he was placed into custody, he indicated that he had the possession of the gun. This was not a case anywhere like those that found or anything like Mason where they found it could apply. But ultimately, the plain language of 922 makes clear that it is knowing possession without regard to intent. And when we look to what was the congressional intention here, I would point the court to just a few sections later in the same chapter, Section 930, also dealing with firearms violations, there Congress created a two-tiered set of penalties, one penalty for knowing possession and one harsher penalty for knowing possession with intent to commit a crime. And so it is very clear that in drafting this firearms regulation, although Judge Strauss has noted there might be some cases that seem unfair, Congress has appropriately weighed those considerations and decided that it is absolutely a risk for felons to be in possession. And the first circuit-used language that I find helpful for that analysis, which is that possession can very quickly turn into retention. And so to the court's point that a felon having it for even mere moments may decide to then use it in a dangerous way is why Congress took this harsh stance and why Congress has appropriately weighed that unavailability of intention-based defenses. So unless the court has any other remaining questions on that, the government rests on its brief and the record and asks this court to affirm below. Thank you. Ms. Atwell for rebuttal? Let me ask you a question before you begin your rebuttal, just to clarify. The court gave an instruction that said the reason the defendant may have had for possessing the firearm and ammunition was irrelevant. And apparently there was an objection, but the giving of that instruction is not objected to on appeal. It's not one of the issues presented on appeal. That is correct, Your Honor. I did note my objection as soon after the court gave it. I didn't specifically object to it in my appeal. The court's correct on that. And if I may just go back to the jury's- that coupled with the fact that there was no instruction requested on this theory of defense, doesn't that really kind of put all this to rest? No, Your Honor, because I do want to address about the jury instruction for the theory of the defense. To be very clear, after the government filed their motion in limine, the court then did a written ruling saying that she would want more information, but it kind of gave a red light that this is probably not going to go with the defense of innocent defense. During trial, after the court heard testimony, after the proffer made it very clear that this was not going to be a defense that's going to be allowed. And at the time, I made an objection continuously. As the court knows, sometimes in criminal trials, the defense theory instruction doesn't come until the end of the trial. The court made it very clear that that was not going to happen. And, in fact, when I object-pardon me-when I did object to the government's jury instruction, I stated that I wanted to continue on with my objection. The court again mentioned the Mason ruling in the D.C. Circuit, and from what I gather from what the court was saying was the facts aren't here to even support anything like Mason. So, in fact, it wasn't so much that I didn't request it by saying, here is a written jury instruction where I want this to be heard to the jury, but it was very clear on the record that that's what I was asking. But the court basically told me at that point, don't address it in your opening, and do not bring it up in your closing, and certainly don't bring it up during cross-examination. And at no time did I argue jury nullification, whether it was before the trial started, during the trial, or after the trial, that was never argued that I was going for jury nullification. And in regards to Mr. Becerra saying he was going to do the right thing, that is true that he said he went to the probation officer to do the right thing, but it was never put in context. What does that mean to do the right thing? Was it to have an appointment with his P.O.? Was it to check in with his P.O.? There was no context such as, I didn't trust the police. I didn't turn in my firearm at 4.30 in the morning. When I went to the Burnsville police at 10 o'clock in the morning, I didn't turn in my gun because of these reasons. But I did keep going to my probation officer three times to turn in that weapon. He didn't get to say that. All he said was to do the right thing, and that can mean many different things. Thank you, Your Honors. Thank you, Counsel. The case has been well briefed and argued, and argument has been helpful for me at least, and we will take it under advisement.